his German colleagues (although he was not being supervised by anyone).  Exhibit 4; Coughlin Affidavit at ¶25

James' work experience while in Germany also has a variety of versions.  In the resume submitted to Avenues, James states he was a "senior consultant" with Sigma International from 1992 to 1996, and then provided alcohol and drug counseling for American executives and their families abroad through Psychological Consultants International from 1996 to 1998.  In his deposition, however, James testified that he worked for Psychological Consultants International from late 1990 or early 1991 through 1997.  James Dep. Vol.1 at 25.  Similarly, he stated in his deposition that he worked for Sigma from late 1990-1993 and again in 1999 or 2000.  James Dep. Vol. I at 28.  Moreover, in his deposition, he indicated that he worked full time as an electronic engineer assistant for Fahrleitungsban GmbH from late 1990 or early 1991 and that he did consulting work through Sigma on evenings and weekends (contrary to the impression given by his resume which would imply that the Sigma work was his full time job and which makes no mention of the Fahrleitungsban job).  When asked to explain the conflicting dates between his resume and his testimony, James responded that the dates on his resumed were "general at best" and that he "didn't submit [his resume] as a true and accurate testament to dates, times and situations."  James Deposition, Vol. I at 55-57.

Black's Law Dictionary defines the term "lie" as "[t]o tell an untruth, to speak or write falsely."  Black's Law Dictionary 940 (8th ed. 2004).  James clearly lied when he represented himself as having a master's degree and a Ph.D, and when he provided a written version of his work history that is inconsistent with his sworn testimony and with later resumes, and claimed to have substantial "internship" experience that does not correspond with the commonly understood meaning of an internship.  These misrepresentations caught up to him when DHSS demanded that he prove that he actually

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

possessed the educational qualifications and work history that he claimed.[6] To the extent that Hegre stated that James had lied or had committed fraud on his resume, Hegre was simply speaking the truth. These statements cannot form the basis for any defamation or other tort claim.

James also alleges that Hegre called him a "thief," although he cannot pin down when this statement was made or to whom, other than the fact that it is contained in a memo made by Major Beveridge, reporting on a conversation between Major Rudd and Hegre as it was recounted to him. However, as another board member testified, James's prior criminal conviction for passing bad checks was brought to light in the course of a background investigation:

> Q:    At some point, did questions arise regarding Mr. James' background?
>
> A:    Yes, through a – Mr. James was asked to be on a board of the Governor's – something to do with substance abuse, and quite frankly, I don't know exactly the particulars. But at one point in time, they were supposed to tour some of the secure facilities up North, and Mr. James, it turned out, had some outstanding warrants and some other issues that – that came up because of that – that we – we became aware of.

---

[6]    Indeed, when James submitted his transcripts and other information to DHSS, he makes no mention of his theory that his credentials are irrelevant, and adds to the misrepresentations by informing the State that that "[i]t should be noted that I have earned multiple degrees from various institutions both in the US and abroad" and that the HSU referenced in the American Psychological Association membership directory "is not in the U.S." In his August 15 deposition, James stated that the Ph.D referenced in the membership directory was not Humbolt State University in California, but was "Humbolt University" in Berlin. James testified that "Humbolt University" was very similar to Vernell, that he did not attend any classes, and that he obtained his degree on the basis of his submission of a paper. Coughlin Affidavit at ¶26. In addition, while he believes he has enough courses to obtain a bachelors' degree on the basis of coursework he took while in the military, he does not possess a college degree of *any* kind from any accredited institution. *Id.*

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

- 22 -

Q:     And what were those issues?

A:     I believe when it was all said and done, it was more to do with some bad check warrants out of Texas. I do not know what the value of the checks were or any of that anymore. . . . I just went to Mr. James and told him that I thought he needed to, you know, get hold of somebody down there and get it cleaned up, make his restitution or do what he needed to do to get square with that. It didn't look good to have a director that had warrants outstanding for him, whether they were extraditable or not.

McCloskey Dep. at 8-9. Broadly, a person commits theft when he or she intends to deprive another of property for the benefit of oneself. *See generally* AS 11.46.100(1). The passing of bad checks fits squarely within the broad definition of theft, and therefore, the purported reference by Hegre calling James a "thief" is justified by the truth of the statement.

With respect to the statement that James had more than one Social Security number, James admits that he has previously transposed numbers in his Social Security number due to dyslexia, and he does not deny that he gave the State a different Social Security number than the one he actually possesses. James Dep. Vol. I at 66-67. Consequently, any statements about James' having more than one social security number are not false, and are therefore not defamatory. In addition, James testified that the rumors regarding his possession of two Social Security numbers originated either from an employee of a local hospital or from an employee at DHSS. *Id.* Mr. Hogan also confirmed in his August 1, 2003 letter that "the Department of Corrections ... could not confirm the identity of Dr. James, based on the social security number he had provided." Exhibit 7 to Coughlin Affidavit. Alaska "follow[s] the rule that 'the privilege [of public discussion] extends to non-malicious misstatements of fact.'" *Id.* (quoting *Pearson v. Fairbanks Pub. Co.*, 413 P.2d 711, 714 (Alaska 1966). Consequently, even if statements about James' use of two social security numbers were not true, Hegre cannot be liable for defamation simply by

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

repeating information provided to him by the State and/or by a hospital administrator, both of whom would ordinarily be viewed as reliable sources.

As discussed above, the statement that James reminded Hegre of criminals he had worked with in the penitentiary is not actionable because it is a subjective opinion. However, to the extent that the statement is verifiable, James bears the burden of proving that he did not, in fact, remind Hegre of the prisoners Hegre worked with in the penitentiary.

Finally, James claims that Hegre defamed him by stating that James had been fired, when in fact (according to James), Hegre had "coerced" him into resigning. Complaint at p. 6. Given the fact that a person may be fired for any reason (or for no reason at all), there is nothing inherently defamatory in the statement that an individual was fired. What James apparently objects to is the accompanying implication that James had committed acts which justified his being fired. However, it is undisputed that if James had not resigned, he would have been fired. James Dep. Vol. 1 at 10-11. As board member Doug McCloskey testified, by this time, the State would no longer fund Avenues unless it could either get proof that James had the necessary qualifications or hired a new executive director, and the Board would have fired James if he had not resigned first:

> Q     And how did that situation ultimately resolve?
>
> A     Exactly the meth -- and Mr. James left. I am not sure whether he resigned first or was fired first or which way that went, but at -- at the time, it was to the point that the board was fully intent on terminating him, and he may have resigned or offered a resignation. I -- I just-- it's been long enough ago now that I don't remember the exact particulars of how that went.
>
> Q     If he hadn't resigned, would the board have fired him?
>
> A     Definitely.
>
> Q     Why?

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

A    Basically for lying on his application, and as far as I'm concerned, he was completely insubordinate to the board, wouldn't provide any of the information asked. I mean, he had just basically -- in my opinion, he decided he wasn't working for us, he was working for himself and would do what he pleased, and the board could go pack sand.

McCloskey Dep. at 25-26.

Under the circumstances, even if it is technically true that James resigned rather than was fired, James cannot rationally argue that his reputation has been damaged by the statement that he had been fired, but would not have been damaged if Hegre had stated that James resigned because Avenues threatened to fire him if he did not. As the Court held in *Fairbanks Pub. Co. v. Pitka*, 445 P.2d 685, 689 (Alaska 1968), falsely reporting that a teacher had been fired when she had in fact resigned was not actionable in that case:

> The assertion that one had been fired from his employment is not defamatory per se, *i. e.*, as a matter of law. As we stated on the first appeal:
>
> > The right to hire implies the right to fire, and therefore a statement that the latter right has been exercised by one's employer does not necessarily have a tendency to injure or discredit the employee who has been discharged. . . .
>
> . . . There was no jury to decide this question at the second trial. As we have already stated, since the trial judge made his decision based on a written transcript of the first trial, we are in as good a position as he to determine whether those to whom the newspaper article was addressed understood the publication in a sense which made it defamatory. We hold that reasonable minded persons would not so understand the publication. We shall not attempt to delineate instances where an untrue statement that one been fired would be defamatory. Suffice it to say that such is not the situation here. The central theme of the newspaper article complained of dealt with the dispute between appellee and her employer. Where a dispute exists between an employer and employee, it is a natural, and probably expected thing to hear that the employee was fired, or discharged from his employment. In such a situation one would not ordinarily think ill of the employee who lost his job-he would not necessarily be discredited or injured by reason of a published story that he had been fired, when in fact

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

he may have resigned instead. We hold that the statement that appellee was fired was not defamatory so as to justify an award of damages to appellee.

*Fairbanks Pub. Co.* also holds that a statement that is not literally true can be sufficiently true to avoid defamation liability:

> The statement 'territorial police called to expel fired schoolmarm' was erroneous. The police were not called for that purpose, but instead had been summoned by appellee because she thought she needed their protection. But she was actually expelled from the school when arrested by Jenkins who, among other things, was a North Pole police officer. Thus, the reported purpose for which the territorial police were called could be considered an immaterial variance from the literal truth. It is not necessary to prove the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.

*Id* at 688. In the instant case, James asserts that he resigned after being informed by Hegre that he would be fired if he did not turn in his letter of resignation. James Dep., Vol I at 10-11. Whether he was technically fired, or resigned in the face of statements that he would be fired if he did not resign, is a distinction without a difference. *See Sheets v. Knight*, 308 Or. 220, 779 P.2d 1000, 1005 & n. 5 (1989) (cited in *Cameron v. Beard*, 864 P.2d 538, 548 (Alaska 1993) for the proposition that where an employer tells an employee to resign or be fired, a court can find the resignation to be a constructive discharge.) As in *Fairbanks Pub. Co.*, the statement is sufficiently true, and a statement that James had been told to resign or be fired would have had the same negative impact as alleged statements about James' being fired. Consequently, the statement cannot support liability for defamation.

**C.    As James' Claims for Intentional Interference with Economic Relations, Intentional Infliction of Emotional, Health and Economic Damages, and Civil Conspiracy Are All Based on Hegre's Allegedly Defamatory Statements, These Claims Must Be Dismissed When the Defamation Claim Fails.**

In addition to defamation, James has alleged three additional claims against The

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

Salvation Army for intentional interference with economic relations, intentional infliction of emotional, health and economic damages, and for civil conspiracy. However, in his August 15, 2008 deposition, James testified that his intentional interference claim was based upon the actions of a woman named Lovey Brock whom he believed was instrumental in preventing Wrangell Wellness (the facility James started after his Avenues' employment) from getting grants that it had been promised. According to James, Hegre had made the same kind of statements which are the subject of his defamation claim to Ms. Brock, and he believes that her actions in blocking his grants are the result of Hegre's statements. Coughlin Affidavit at ¶27.

Similarly, his civil conspiracy claims are based on his belief that Hegre made the same kinds of statements he alleges are defamatory to Ms. Brock and to the ministerial alliance (a group of pastors and other religious leaders in Wrangell). Coughlin Affidavit at ¶28. As stated in his Complaint, his claim for intentional infliction of emotional, health and economic damages is based on the damage he alleges he suffered as a result of Hegre's defamatory statements.

All of these claims require that some kind of wrongful act be performed. See *RAN Corp. v. Hudesman*, 823 P.2d 646, 648 (Alaska 1991) (two of the elements of intentional interference are that the defendant's wrongful conduct has engendered the breach and that the defendant's conduct was not privileged or justified); *State v. Carpenter*, 171 P.3d 41, 58 (Alaska 2007) (an IIED claimant must prove that there was "extreme and outrageous conduct" that intentionally or recklessly inflicted severe emotional distress, and conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.) Similarly, a civil conspiracy must have some kind of tortious goal (alleged by James' complaint as being the malicious dispersal of false information for the sole purpose

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

of destroying Plaintiff's reputation.)  In all of these instances, if the court finds as a matter of law that the defamation claim cannot survive summary judgment, these other tort theories must also be dismissed:  if Hegre's statements are not tortious, there is no wrongful act to serve as the basis for additional liability.

**D.    The Salvation Army is not Liable for Statements Hegre Made as a Board Member of a Separate Nonprofit Organization.**

Finally, even if there were factual issues which might prevent the entry of summary judgment on the issue of whether defamatory statements were made, claims against The Salvation Army should nevertheless be dismissed because James has not provided evidence to support his claim that Hegre's employer should be liable for these statements.

James has not sued Hegre, but has instead alleged defamation claims against The Salvation Army for statements made by its officer.  However, James has not provided evidence that the alleged defamatory statements made by Hegre were made in his capacity as a Salvation Army officer, rather than as a board member of the separate Avenues nonprofit organization or in Hegre's personal capacity, neither of which would be The Salvation Army's responsibility.

James has stated his belief that because Hegre was a Salvation Army officer and minister, his statements carried special weight in the Wrangell community.  James Dep. Vol. II at 44-46.  In James' view, The Salvation Army is liable for all statements made by any of their officers at any time under any circumstances because of what he alleges is a special relationship between The Salvation Army and the community at large.  However, under the doctrine of respondeat superior, an employer may only be held liable for the negligent acts or omissions of its employee if those acts or omissions occur within the course and scope of employment.  *Parnell v. Peak Oilfield Service Co.*, 174 P.3d 757, 768 (Alaska 2007) (citing *Powell v. Tanner*, 59 P.3d 246, 248 (Alaska 2002); Prosser & Keeton

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

on the Law of Torts § 70, at 501-03 (W. Page Keeton et al. eds., 5th ed. 1984)).  James'
"special weight" theory (which would make the scope of respondeat superior liability
contract or expand on the basis of the esteem with which a particular employer is held) has
no basis in the case law.

The Alaska Supreme Court has adopted the standards set forth in the Restatement
(Second) of Agency §§ 228-29 for determining whether a particular act or omission
occurred within the scope and course of employment.  *Parnell*, 174 P.3d at 768 (citations
omitted).  As set forth in *Parnell*:

> Section 228 describes the circumstances required to bring conduct within
> the scope of employment as well as those establishing conduct fully
> outside that scope:
>
> (1) Conduct of a servant is within the scope of employment if, but only if:
>
>> (a) it is of the kind he is employed to perform;
>>
>> (b) it occurs substantially within the authorized time and space limits;
>>
>> (c) it is actuated, at least in part, by a purpose to serve the master, and
>>
>> (d) if force is intentionally used by the servant against another, the use of
>> force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is
> different in kind from that authorized, far beyond the authorized time or
> space limits, or too little actuated by a purpose to serve the master.

*Id.* (citing Restatement (Second) of Agency § 228).

The Restatement (Second) of Agency § 229 "elaborates on the circumstances
required under section 228 and lists several factors relevant to determining their presence.
*Id.*  Section 229 provides that "[t]o be within the scope of the employment, conduct must be
of the same general nature as that authorized, or incidental to the conduct authorized."

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

- 29 -

Restatement (Second) of Agency §229. It then explains that considerations relevant in determining whether an act meets these standards, including:

> (a) whether or not the act is one commonly done by such servants;
>
> (b) the time, place, and purpose of the act;
>
> (c) the previous relations between the master and the servant;
>
> (d) the extent to which the business of the master is apportioned between different servants;
>
> (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
>
> (f) whether or not the master has reason to expect that such an act will be done;
>
> (g) the similarity in quality of the act done to the act authorized;
>
> (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
>
> (i) the extent of the departure from the normal method of accomplishing an authorized result; and
>
> (j) whether the act is seriously criminal.

Restatement (Second) of Agency § 229. In order for the theory of respondeat superior to apply, "[t]he acts of the employee need to be so connected to his employment as to justify requiring that the employer bear that loss." *Fruit v. Schreiner*, 502 P.2d 133, 141 (Alaska 1972).

In *Commercial Bank v. Hearn*, 923 So.2d 202 (Miss. 2006), the Mississippi Supreme Court recently held that a bank was not liable under respondeat superior for the negligent acts of its employee when the employee was involved in a car accident with the

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

- 30 -

plaintiff while delivering charity pledge solicitation packages to a local business during the workday. Despite the undisputed facts that the bank encouraged its employees to be responsible citizens, community involvement factored into hiring decisions, and the bank contributed to various charitable organizations, the court held that the bank employee's charitable activities were outside the course and scope of his employment, even if the bank may have indirectly benefited from the employee's charitable activities and the activities occurred during the normal workday. *Id.* at 205, 208. In applying the Restatement (Second) of Agency § 228, the *Commercial Bank* court reasoned:

> We find the [plaintiffs] have failed to produce evidence which satisfies [the] requirement of §228(1)(a). [The employee's] "conduct" was delivering solicitation packages for the United Way. No proof is before us that [the employee] was "employed to perform" that kind of "conduct." Nor is it enough to say that [the employee's] good deeds might have resulted in new customers for the Bank. *A test so broad as this would render most employers vicariously liable for virtually all of their employee's activities.* For instance, Thornton's visit to the doctor for a check-up, and his shopping trip to the mall could both certainly result in new business for the Bank, since (the plaintiff would argue) doctors and business persons often reciprocate by doing business with their patients or customers. And it could be forcefully argued that the Bank's best interest is well served when employees obtain regular medical check-ups and stay healthy. The imposition of vicarious liability under these examples is no more unacceptable than the proposition that the Bank should be held vicariously liable because [the employee's] charitable work might result in new business for the Bank.

*Commercial Bank*, 923 So.2d at 208 (emphasis added).

Under similar reasoning, the Alaska Supreme Court has held that employers should not be held responsible for the acts of intoxicated employees, even though the employer served the employee alcohol at a company-sponsored event occurring during the workday. *See Mulvihill v. Union Oil Co. of California*, 859 P.2d 1310 (Alaska 1993). The *Mulvihill*

K&L GATES LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969