**Page 10**

1 A  Sure.
2 Q  You said that Mr. Hegre misrepresented
3 information that was exclusive to the Avenues
4 board about you. What information did he
5 misrepresent that was exclusive to the Avenues
6 board?
7 A  One piece of information was that he
8 conveyed to members of the local community --
9 that much I heard on my own -- and to the general
10 regional community that he fired me. That is not
11 true.
12 Q  Did Mr. Hegre threaten to fire you if
13 you didn't resign?
14 A  He threatened to fire me -- let me say,
15 first, during a phone call on or about 11, 12
16 November 2003 -- he called my house several
17 times. He left several messages. These messages
18 were agitated at best. When I returned his call,
19 he asked me: When are you coming in to resign,
20 or when are you going to submit your letter of
21 resignation?
22      I said I would like to talk to the
23 board first, so I would like to be present at the
24 next board meeting. He lost his composure, and
25 he told me that I reminded him of the criminals

**Page 11**

1 that he worked with in the penitentiary, that
2 either I turn in my letter of resignation or that
3 he was going to fire me.
4 Q  How did you respond?
5 A  I was taken aback. I didn't exactly
6 know how to respond. I was rather embarrassed,
7 because my wife had been upstairs and we have an
8 answering machine that kicks on, and if you
9 answer before the answering machine has done its
10 work, it broadcasts, and so she had heard
11 everything that Mr. Hegre had said. So I can
12 actually hear the echo downstairs. So I was a
13 bit uneased, and I can't be certain of my
14 response. I was befuddled. I didn't know why he
15 was talking to me in this way, and I don't
16 believe I gave him an answer. I may have hung up
17 on him.
18 Q  Do you think that your wife's opinion of
19 you was altered by hearing what Mr. Hegre had to
20 say about you?
21 A  At this point Mr. Hegre had made it
22 known that I was not his favorite person in the
23 world, and she was beginning to feel fear. I was
24 speaking with someone in the community that I was
25 working with, and the person appreciated the work

**Page 12**

1 that I was doing and said, did you know that
2 Captain Hegre is saying these things? And I had
3 no idea that he'd be saying anything actually at
4 that time. I didn't see a reason that that would
5 even happen. And these things got back to my
6 wife and she began to fear.
7 Q  Afraid that you would lose your job?
8 A  No. Actually after these comments, the
9 comments became racially derogatory and she was
10 afraid that we would be hurt, or more that I
11 would be hurt.
12 Q  Well, let's go back.
13      Who is the person in the community
14 who asked you whether you knew that Hegre was
15 saying these things?
16 A  I'm trying to remember her name. I was
17 working with her son. The name does not come to
18 me at the moment, but I think I'll be able to
19 come up with the name before we finish today.
20 It's there; it's been a long time.
21 Q  And when this person asked you whether
22 you knew Hegre was saying these things, what
23 things did this woman tell you that Hegre was
24 saying?
25 A  Let me try to narrow them down, because

**Page 13**

1 I believe I was still with the Avenues program at
2 this time. He said that he was investigating my
3 background because I had given false information.
4 What else? He said something else. He said that
5 I lied and had more than one Social Security
6 number and other derogatory things. I can't be
7 exact.
8      The woman's first name was Debbie
9 or Deborah. And I'll get the last name.
10 Q  Okay. And you said that after this the
11 comments became racially derogatory?
12 A  Uh-huh.
13 Q  Was Mr. Hegre making these comments to
14 you directly, or were people coming to tell you
15 that Mr. Hegre had said something racially
16 derogatory, or am I on the wrong track entirely?
17 A  I was the only black man on the island.
18 I had never been approached with racial comments
19 before. Most people had been generally
20 accepting, even nice, but never derogatory.
21 Captain Hegre took issues to his parish -- and
22 I'm calling his church a parish. I don't know
23 another name for it. He took them back to his
24 church, and that's where these things were coming
25 from.

4 (Pages 10 to 13)

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

Exhibit 17
Page 3 of 9
fd6072f6-af0c-48d5-b59d-cacae5a44230

Ellsworth Alexander James
July 30, 2008

Page 10

1  A   Sure.
2  Q   You said that Mr. Hegre misrepresented
3  information that was exclusive to the Avenues
4  board about you.  What information did he
5  misrepresent that was exclusive to the Avenues
6  board?
7  A   One piece of information was that he
8  conveyed to members of the local community --
9  that much I heard on my own -- and to the general
10 regional community that he fired me.  That is not
11 true.
12 Q   Did Mr. Hegre threaten to fire you if
13 you didn't resign?
14 A   He threatened to fire me -- let me say,
15 first, during a phone call on or about 11, 12
16 November 2003 -- he called my house several
17 times.  He left several messages.  These messages
18 were agitated at best.  When I returned his call,
19 he asked me: When are you coming in to resign,
20 or when are you going to submit your letter of
21 resignation?
22     I said I would like to talk to the
23 board first, so I would like to be present at the
24 next board meeting.  He lost his composure, and
25 he told me that I reminded him of the criminals

Page 11

1  that he worked with in the penitentiary, that
2  either I turn in my letter of resignation or that
3  he was going to fire me.
4  Q   How did you respond?
5  A   I was taken aback.  I didn't exactly
6  know how to respond.  I was rather embarrassed,
7  because my wife had been upstairs and we have an
8  answering machine that kicks on, and if you
9  answer before the answering machine has done its
10 work, it broadcasts, and so she had heard
11 everything that Mr. Hegre had said.  So I can
12 actually hear the echo downstairs.  So I was a
13 bit uneased, and I can't be certain of my
14 response.  I was befuddled.  I didn't know why he
15 was talking to me in this way, and I don't
16 believe I gave him an answer.  I may have hung up
17 on him.
18 Q   Do you think that your wife's opinion of
19 you was altered by hearing what Mr. Hegre had to
20 say about you?
21 A   At this point Mr. Hegre had made it
22 known that I was not his favorite person in the
23 world, and she was beginning to feel fear.  I was
24 speaking with someone in the community that I was
25 working with, and the person appreciated the work

Page 12

1  that I was doing and said, did you know that
2  Captain Hegre is saying these things?  And I had
3  no idea that he'd be saying anything actually at
4  that time.  I didn't see a reason that that would
5  even happen.  And these things got back to my
6  wife and she began to fear.
7  Q   Afraid that you would lose your job?
8  A   No.  Actually after these comments, the
9  comments became racially derogatory and she was
10 afraid that we would be hurt, or more that I
11 would be hurt.
12 Q   Well, let's go back.
13     Who is the person in the community
14 who asked you whether you knew that Hegre was
15 saying these things?
16 A   I'm trying to remember her name.  I was
17 working with her son.  The name does not come to
18 me at the moment, but I think I'll be able to
19 come up with the name before we finish today.
20 It's there; it's been a long time.
21 Q   And when this person asked you whether
22 you knew Hegre was saying these things, what
23 things did this woman tell you that Hegre was
24 saying?
25 A   Let me try to narrow them down, because

Page 13

1  I believe I was still with the Avenues program at
2  this time.  He said that he was investigating my
3  background because I had given false information.
4  What else?  He said something else.  He said that
5  I lied and had more than one Social Security
6  number and other derogatory things.  I can't be
7  exact.
8      The woman's first name was Debbie
9  or Deborah.  And I'll get the last name.
10 Q   Okay.  And you said that after this the
11 comments became racially derogatory?
12 A   Uh-huh.
13 Q   Was Mr. Hegre making these comments to
14 you directly, or were people coming to tell you
15 that Mr. Hegre had said something racially
16 derogatory, or am I on the wrong track entirely?
17 A   I was the only black man on the island.
18 I had never been approached with racial comments
19 before.  Most people had been generally
20 accepting, even nice, but never derogatory.
21 Captain Hegre took issues to his parish -- and
22 I'm calling his church a parish.  I don't know
23 another name for it.  He took them back to his
24 church, and that's where these things were coming
25 from.

4 (Pages 10 to 13)

Exhibit 1.7

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

Page 4 of 9

fd6072f6-af0c-48d5-b59d-cacae5a44230

Ellsworth Alexander James
July 30, 2008

Page 14

1  Now, I know that shortly after this
2  things started to change. So any what I would
3  call ambient racism was given the green light,
4  and we started to see this more and more often.
5  Now, Captain Hegre was a member of
6  just about every community organization in town.
7  He represented The Salvation Army with the school
8  district, with the legion -- legionnaires. He
9  was on some of the Native boards. He was on the
10 city boards. So not only through his parish, but
11 through these other entities he was expressing
12 his discontent or malcontent for my person, and
13 these people basically put that wherever they
14 wanted to put it.
15     I would not say that he expressed
16 negative racial epithets, but I will say that
17 being a pastor, a religious figure, I will say
18 that those in his parish, those that considered
19 themselves healant would say things they wouldn't
20 have normally said, thinking that it might please
21 him, that it might be in line with where he is,
22 in line with what he thinks. Small communities
23 tend to be religious and people tend to follow
24 their pastor.
25 Q  When you say that Hegre took issues to

Page 15

1  his parish, what issues did he take?
2  A  Well, basically everything that was
3  discussed in Avenues board meetings I heard back,
4  I heard reverberated through members of his
5  parish and through other community leaders or
6  people in other community organizations.
7  Q  So Mr. Hegre was telling people what had
8  gone on in the board meetings?
9  A  Yes.
10 Q  And was he repeating the same sorts of
11 statements that Deborah told you he was making,
12 that you were being investigated because you had
13 given false information, that you had more than
14 one Social Security number?
15 A  He was getting personal -- depending on
16 who he was talking to, he was giving more
17 personal slights, slights against my character.
18 And after the point that I resigned from the
19 Avenues board, they continued. Well, I fired him
20 because of this and I fired him because of that.
21 Q  And what were the thises and the thats
22 that Mr. Hegre was saying he fired you for?
23 A  One of the biggest was that he said that
24 I misrepresented my credentials. He said more to
25 other people. He said that I was a liar. He

Page 16

1  said that I was a thief. He added other things,
2  but along those venues, liar, thief.
3  Q  And who were the other people that he
4  said these things to?
5  A  One other person that I know for sure
6  was his direct supervisor, Major Rudd. Another
7  would be a contact here in Anchorage, a regional
8  person for the Girls and Boys Club, Guy
9  Klabundie. I believe that's his last name.
10 Q  And other than Mr. Klabundie and Major
11 Rudd, do you know any other person that he would
12 have said these things to?
13 A  Those are the only people -- there may
14 be one or two other people that I can actually
15 call by name, and perhaps before the end of this
16 deposition those will come to me. I'm still
17 trying to remember Deborah's last name. Maybe
18 one or two more people that I can call by name,
19 but I can say that he talked to people with the
20 State, one of which you deposed before. I can't
21 remember his name.
22 Q  Bill Hogan?
23 A  Bill Hogan. People with the legion, of
24 which he was a member and an officer. And I will
25 say other people of the upper echelon in the

Page 17

1  Wrangell community that didn't say anything, but
2  actually treated me differently, and I can
3  logically assume that he said those to these
4  people as well.
5  Q  We'll probably come back to these
6  subjects in a bit, but let's go back to the
7  beginning of your relationship with Avenues.
8  A  Okay.
9  Q  How did you come to be involved with
10 them?
11 A  I was actually consulting for a firm in
12 Florida and that consulting project connected me
13 with Alaska. I liked Alaska and, you know, went
14 back home and said, hey, babe, you know, Alaska,
15 think about it. You know, we were looking for a
16 smaller environment. We had just moved back to
17 the United States from Europe and living in a big
18 city, and didn't like big city life, especially
19 for our small children and we were looking for a
20 smaller community.
21     On top of that I was doing research
22 on special populations and I hadn't studied
23 Alaska Natives, so I was looking for an
24 opportunity to do that. And I found an ad for an
25 agency director, an agency that dealt with social

5 (Pages 14 to 17)

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

Exhibit 17
Page 5 of 9

fd6072f6-af0c-48d5-b59d-cacae5a44230

Ellsworth Alexander James
July 30, 2008

Page 50

1  certain threshold, then there was no choice, but
2  first the guy we have, and unfortunately if we
3  have to go that later. But I was able to develop
4  programs that addressed substance abuse issues
5  and promoted an environment of talking that
6  enabled a person not to isolate and to do
7  something, to take advantage of tools.
8       I mean, all the companies had
9  tools. They all had hot lines that you could
10 call or people that you could go to. But, you
11 know, being an expatriate the first thing you do
12 when you have an issue is you isolate. Part of
13 what I did is I addressed that to kind of open
14 the person up for other things. Being on an
15 island, I thought, is probably similar. You're
16 cut off from a lot of services. You're cut off
17 from a lot of things. A lot of isolation going
18 on.
19      With my project development
20 background, I thought I could help develop new
21 programs. I'm an on-the-ground kind of person.
22 I look, I see, I assess, I do. I thought that's
23 what I would bring to the table. They asked me
24 about my education and credentials and I told
25 them, I said, listen, I've been in Europe for the

Page 51

1  past 20 years, give or take. I've got college
2  credits. I've got many credits. I actually have
3  a Ph.D., but it's not nothing that's going to
4  mean anything here in the United States. I
5  basically set up my own curriculum. If you want
6  someone that can be licensed, I'm not the person
7  you want. I'm not licensed now, nor will I ever
8  be licensed. I don't do those kinds of things.
9       I develop projects, I develop
10 programs and I manage them. I believe that's
11 what you need as the director of this
12 organization. If you have programs that are not
13 working, then they have to be rethought. It
14 seems to me that there are programs that need to
15 be developed, and if that's what you want to do,
16 I'm the person that can help you do that.
17      So -- and I made this clear, which
18 is what confuses everything down the road. I
19 said, if you want someone with verifiable
20 credentials, if you want someone that's able to
21 be licensed, I can't do that for you. My value
22 to your organization is in my experience. And
23 the only person that had a comment about that was
24 McCloskey, but everybody else thought, you know,
25 I like what he's saying. I think that's what we

Page 52

1  need. And I was told that I would hear from them
2  in a few days.
3     Q   What was the comment that Mr. McCloskey
4  made?
5     A   He made two comments. He made them kind
6  of together. One is he looked at my time with
7  Office Depot. And the one thing he says is,
8  well, how does Office Depot have anything to do
9  with what we're doing here? And his other
10 comment had to do with licensure. I can't
11 remember exactly what it was, but he kind of
12 mumbled something about, what if we need
13 something with licensure? And then someone else
14 said, he didn't have to be licensed.
15      And actually in the offer that I
16 got a few days later, the offer stated that I had
17 to apply for certification in substance abuse
18 within the first year, and that was the only
19 other -- that was the only other -- that was the
20 only requirement that I had when I accepted the
21 position.
22    Q   Other than the work with the executive
23 coaching that you've talked about, had you had
24 any other work with substance abuse?
25    A   Yeah, I did. I was director of the

Page 53

1  Kiwanis Center for Women, and that was almost
2  exclusively substance abuse. I had therapists
3  that actually worked for me in the center, but I
4  designed and developed group sessions for the
5  women, in which I participated. The therapist
6  was there. I participated in the group. I
7  actually directed the groups, and I did
8  one-on-one day-to-day assessments with the women,
9  getting them to apply for social services for
10 whatever they might need, that sort of thing.
11    Q   And what year was this?
12    A   '89 to '90. I also during that period
13 of time, and just before that, I worked under
14 Dr. J. L. Patterson, a psychologist in Houston,
15 as part of his staff. It wasn't exclusively
16 substance abuse, but it was predominantly
17 substance abuse.
18    Q   And what sort of work were you doing
19 under Dr. Patterson's supervision?
20    A   Just that, substance abuse. It wasn't
21 exclusively substance abuse, but mostly substance
22 abuse and counseling.
23    Q   So counseling of people with substance
24 abuse problems?
25    A   Uh-huh.

14 (Pages 50 to 53)

Exhibit 17
Page 4 of 9

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

fd6072f6-af0c-48d5-b59d-cacae5a44230

Ellsworth Alexander James
July 30, 2008

Page 50

certain threshold, then there was no choice, but first the guy we have, and unfortunately if we have to go that later. But I was able to develop programs that addressed substance abuse issues and promoted an environment of talking that enabled a person not to isolate and to do something, to take advantage of tools.

I mean, all the companies had tools. They all had hot lines that you could call or people that you could go to. But, you know, being an expatriate the first thing you do when you have an issue is you isolate. Part of what I did is I addressed that to kind of open the person up for other things. Being on an island, I thought, is probably similar. You're cut off from a lot of services. You're cut off from a lot of things. A lot of isolation going on.

With my project development background, I thought I could help develop new programs. I'm an on-the-ground kind of person. I look, I see, I assess, I do. I thought that's what I would bring to the table. They asked me about my education and credentials and I told them, I said, listen, I've been in Europe for the

Page 51

past 20 years, give or take. I've got college credits. I've got many credits. I actually have a Ph.D., but it's not nothing that's going to mean anything here in the United States. I basically set up my own curriculum. If you want someone that can be licensed, I'm not the person you want. I'm not licensed now, nor will I ever be licensed. I don't do those kinds of things.

I develop projects, I develop programs and I manage them. I believe that's what you need as the director of this organization. If you have programs that are not working, then they have to be rethought. It seems to me that there are programs that need to be developed, and if that's what you want to do, I'm the person that can help you do that.

So -- and I made this clear, which is what confuses everything down the road. I said, if you want someone with verifiable credentials, if you want someone that's able to be licensed, I can't do that for you. My value to your organization is in my experience. And the only person that had a comment about that was McCloskey, but everybody else thought, you know, I like what he's saying. I think that's what we

Page 52

need. And I was told that I would hear from them in a few days.

Q    What was the comment that Mr. McCloskey made?

A    He made two comments. He made them kind of together. One is he looked at my time with Office Depot. And the one thing he says is, well, how does Office Depot have anything to do with what we're doing here? And his other comment had to do with licensure. I can't remember exactly what it was, but he kind of mumbled something about, what if we need something with licensure? And then someone else said, he didn't have to be licensed.

And actually in the offer that I got a few days later, the offer stated that I had to apply for certification in substance abuse within the first year, and that was the only other -- that was the only other -- that was the only requirement that I had when I accepted the position.

Q    Other than the work with the executive coaching that you've talked about, had you had any other work with substance abuse?

A    Yeah, I did. I was director of the

Page 53

Kiwanis Center for Women, and that was almost exclusively substance abuse. I had therapists that actually worked for me in the center, but I designed and developed group sessions for the women, in which I participated. The therapist was there. I participated in the group. I actually directed the groups, and I did one-on-one day-to-day assessments with the women, getting them to apply for social services for whatever they might need, that sort of thing.

Q    And what year was this?

A    '89 to '90. I also during that period of time, and just before that, I worked under Dr. J. L. Patterson, a psychologist in Houston, as part of his staff. It wasn't exclusively substance abuse, but it was predominantly substance abuse.

Q    And what sort of work were you doing under Dr. Patterson's supervision?

A    Just that, substance abuse. It wasn't exclusively substance abuse, but mostly substance abuse and counseling.

Q    So counseling of people with substance abuse problems?

A    Uh-huh.

14 (Pages 50 to 53)

Exhibit 17

Page 7 of 9

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

fd6072f6-af0c-48d5-b59d-cacae5a44230