Ellsworth Alexander James
August 1, 2008

Page 18

1  Loren Jones shortly after I was hired just before
2  he retired. I asked him about this, and he said,
3  something's wrong with that. Out in rural areas
4  it's hard to find anybody and, you know, we never
5  required -- we never required a director to have
6  specific credentials or specific certifications
7  because it's very hard to find someone with those
8  certifications.
9       That's why the board could hire
10 anyone that they felt could actually deliver
11 through work experience or what have you, and
12 that was one of the major differences between the
13 Division of Alcohol and Substance Abuse and
14 behavioral health. Most people that worked in
15 these organizations under the Division of Alcohol
16 and Substance Abuse were not certified. A lot of
17 them the only certification that they had was
18 that they were in recovery.
19       So to be more specific, according
20 to Alaska statute at that time -- it may have
21 changed or it may have been rewritten after
22 that -- but according to Alaska statute at that
23 time, the State could not dictate who a board
24 could hire. Now, if that organization had a
25 grant through the State, they could -- they

Page 19

1  could -- and how did he put it? Advise, or they
2  could -- he didn't use the word require. Suggest
3  that someone in this position have these
4  credentials. And I think the last director,
5  Mr. Hogan, also said in his letters that the
6  State cannot dictate who the board can hire.
7       Now, again, going back to the
8  impetus of your question. The board hired me.
9  The board hired me -- they gave me an offer of
10 employment based on our conversations, based on
11 what I told them that I could deliver. Now, if
12 they misunderstood their relationship with the
13 State, that's not between me and them; that's
14 between them and the State. So if the State was
15 going to withhold funds, that's entirely between
16 the board and the State. It's something they
17 have to iron out.
18      Now, if that had happened and if
19 Captain Hegre had represented the accurate
20 scenario of my hiring, if he had accurately
21 represented what had transpired in those
22 pre-offer conversations, then I could have helped
23 the board to reach some kind of an agreement with
24 the State in regard to what the statute was at
25 that time, what the need was in the community and

Page 20

1  what I was able to do in the community. I never
2  got an opportunity to do that because he didn't
3  represent what happened.
4       And, in essence, I believe that the
5  State may have taken a different tack had they
6  had the information. They didn't have the
7  information. According to this, they are led to
8  believe -- they are assuming based on this
9  information that I presented these and that I
10 represented myself and I said these are
11 certified, these are what I am using for my
12 employment. Not the case. Didn't happen. They
13 didn't know that.
14   Q   Were you in direct communication with
15 the State during this period?
16   A   I would have to say I wasn't in direct
17 communication because any time I tried, they
18 wouldn't talk to me. That's not meaning to say I
19 didn't try.
20   Q   And I think one of the exhibits that we
21 looked at before was the 23-page fax that you
22 sent to Karen Pearson.
23   A   Sure.
24       (Exhibit 10 marked.)
25   Q   Is Exhibit 10 a letter dated

Page 21

1  August 28th, 2003 that you wrote to Joel
2  Gilbertson?
3   A   Uh-huh.
4   Q   In this letter do you represent yourself
5  as having been a consulting psychologist for over
6  15 years?
7   A   Yes. Yes, I do represent myself as
8  being a consulting psychologist for over 15
9  years. And as I said previously, I've lived --
10 I'm 47 years old and I've lived outside the
11 country almost as long as I have in, and what you
12 call yourself depends on where you are. And, to
13 me, a consulting psychologist has -- is not what
14 you would consider a psychologist in this
15 country.
16      Again, I have to reiterate that
17 this should never have been a topic of discussion
18 in that this is not what I represented in order
19 to receive an offer of employment. This is not
20 what was presented during the initial
21 conversations. Now, referring to myself as a
22 consulting psychologist does not insinuate that I
23 have licensure, and I believe that's what you're
24 getting at. The term psychologist in this
25 country. Okay. Not what I was doing. Not what

6 (Pages 18 to 21)
Exhibit 18
Page 4 of 12

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

3fc1570b-59b2-4e6b-a7a2-94e950245e02

Ellsworth Alexander James
August 1, 2008

Page 30

1  I was livid. I said, you know what, I'm in a
2  great deal of pain. I had oral surgery today. I
3  should be at home, and I'm going home and that's
4  what I did. The meeting as at 8:00. I left the
5  office at 6:30. I told them why I wasn't going
6  to be there, and that was the last opportunity I
7  had to actually address the board about this
8  issue all at once.
9         (Exhibit 13 marked.)
10     Q   Is Exhibit 13 a letter you wrote to the
11  board dated November 10, 2003?
12     A   Uh-huh.
13     Q   And it states at the top, Avenues to
14  Recovery, Governing Board Special Meeting. Was
15  this a letter that you gave to the board in lieu
16  of attending a meeting, or did you present this
17  letter at the board meeting?
18     A   I didn't give this letter at the board
19  meeting. I left this for the board. This was
20  directed to the board.
21     Q   And was it something that you wanted
22  them to consider at the November 10th special
23  meeting?
24     A   At this point this was information that
25  I thought they should have. What they did with

Page 31

1  it was up to them. My train of thought at this
2  period in time was that if my qualifications were
3  not acceptable -- I had been there past the
4  six-month point at this time. My probation was
5  over. They had called my references and that was
6  deemed satisfactory. Now, if it was not enough,
7  we could have parted company and at that time if
8  that had happened -- if it happened in early 2003
9  before I signed the contract on the house, fine.
10  Not a good fit; I move on. Wasn't the case.
11     Q   What sort of a contract did you sign on
12  the house?
13     A   I signed a contract to buy my home.
14     Q   And was it some sort of a lease/purchase
15  agreement?
16     A   No, not a lease/purchase agreement.
17  Something that happens a lot in rural areas is
18  owners -- how would you call it -- they carry
19  their own paper. They actually -- there's an
20  actual word for it. There's a legal real estate
21  term for it which escapes me.
22     Q   Seller financed?
23     A   Seller finance, I guess, for lack -- or
24  perhaps that's it. Most people do that. And
25  this particular home was something that we liked.

Page 32

1  It was built in 1904. It was the only brick
2  house on the island. It had some charm to it,
3  and my wife and I decided that this is where we
4  want to live and we wanted to redo it. We wanted
5  to remodel it. So we signed the agreement to
6  purchase the house directly from the seller and,
7  you know, put the deposit down and signed the
8  contract.
9     Q   And at some point did you default on
10  that contract?
11     A   Sure did.
12     Q   And when did that happen?
13     A   At some point the following year.
14     Q   So in 2004?
15     A   It was probably 2005 actually. I
16  can't -- without looking at my notes, without
17  looking at my paperwork, I can't be exact. I
18  mean, I've got the contract and the
19  correspondence with the owner, but I couldn't
20  tell you now exactly when that was.
21     Q   And going back to something you
22  mentioned earlier. If you do have minutes from
23  the Avenues meetings, I would greatly appreciate
24  you just either mailing or e-mailing me a copy.
25     A   Uh-huh.

Page 33

1     Q   So getting back to the November 10th,
2  2003 letter. You indicate that you're not going
3  to provide further documentation and should your
4  statement not provide -- not be sufficient, you
5  can consider this a resignation, the conditions
6  of which are three months severance pay and an
7  equal amount of time to catch of files and close
8  and transfer clients.
9     A   Uh-huh.
10     Q   Was your resignation conditional on
11  their accepting that you would be paid for the
12  next six months?
13     A   It wasn't conditional. When I wrote
14  this, it was basically up to them. So the
15  resignation was not so that I'm not resigning if
16  you don't do this. The resignation is that
17  consider this a resignation, or this is my
18  resignation if we don't come to some kind of
19  agreement. We didn't come to any kind of
20  agreement. The only agreement after that was
21  that I resign or be fired.
22     Q   Did Avenues subsequently offer you any
23  sort of severance pay?
24     A   No, they didn't offer me any severance
25  pay. What they offered me -- I received a letter

9 (Pages 30 to 33)

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

Exhibit 18
Page 5 of 12

3fc1570b-59b2-4e6b-a7a2-94e950245e02

Ellsworth Alexander James
August 1, 2008

Page 54

1  Not being able to go out in public because it's
2  just so darned uncomfortable increased the
3  already severe amount of stress that I was
4  already on.
5     Q    If I can just stop you here. The
6  statements that you refer to Mr. Hegre making
7  were that you had lied on your resume, that you
8  had been fired rather than resigned, possibly
9  that you were a thief and that you were a liar?
10    A    All of that plus whatever else he threw
11 in.
12    Q    And what else did he throw in?
13    A    I can't tell you that. What you can say
14 is, you know, general defamation. The guy spoke
15 out against me. Being a public figure, being a
16 pastor of the community, people took that
17 wherever they wanted to take it. So it's
18 something that they -- everything that they had
19 in their personal lives that wasn't going well
20 was automatically directed at me.
21    Q    But in terms of statements that
22 Mr. Hegre made --
23    A    Those statements are the ones that you
24 can put on the books, but I think you can read
25 into those statements -- especially the

Page 55

1  statements that were reported by Major Rudd and
2  those that were reported to Guy Klabundie because
3  he got a taste of his anger there, you could see
4  the underlying contempt. I think the -- you
5  remind me of the prisoners that I worked with in
6  the penitentiary says a lot about the tone in
7  which he said these things.
8         And so in answer to your question,
9  this increased the already tremendous amount of
10 stress that I was under. My wife was emotionally
11 and physically ill. My children were being
12 discriminated against. This hadn't happened
13 before this happened. People kept their -- if
14 they had these opinions, they kept them to
15 themselves. After this, everything was
16 expressed. Not being able to continue working.
17 Losing my house and generally feeling that
18 they're going to burn a cross in my yard, okay,
19 added greatly to what I had to deal with, and at
20 the same time I'm continuing my work.
21        I've got educational programs
22 going. I've got people that are delivering
23 services, social services to people that actually
24 need them. I've got things that were going on.
25 The wellness program was actually doing quite

Page 56

1  well in spite of a lot of the things that he was
2  doing. Now, what he was doing is he was cutting
3  off my sources of revenue. Because like I said,
4  The Salvation Army has big feet. A lot of people
5  don't ask questions when a member or
6  representative of The Salvation Army says that
7  this person did this, this person did that, this
8  person is not something that you should be
9  dealing with.
10        That caused significant harm. And
11 basically when I went for my yearly checkup in
12 April 2004 or thereabout, my ejection factor was
13 below 30 percent. The doc says, listen, I'm
14 sending you to Walter Reed or Seattle, whichever
15 I can get you in first. Right now you are a
16 prime candidate for sudden cardiac death. Your
17 ejection factor is so low that you can drop dead
18 at any minute. The normal ejection factor is
19 around 55. Okay. Yours is below 30. Your heart
20 is so weak that it's barely pumping. It's not
21 pumping enough to keep you going. That's why
22 you're having dizzy spells. That's why you're
23 having this, that and the other. I was
24 immediately put on medication and I ended up
25 going to Seattle for an arteriogram. They did a

Page 57

1  3-d echo at the Heart Institute here in
2  Anchorage. He says, there are two scars on your
3  lower left ventricle. These are evidence of
4  damage to your heart. And I says, I'm athletic,
5  I don't drink to excess, I drink hardly at all, I
6  don't smoke, I exercise. I've never had a
7  problem like this before. He said, looking at
8  your file, it looks like you must have been under
9  a tremendous amount of stress. I said yes. He
10 says, you know, being an African American you're
11 already under an amount of stress just by being
12 black. This extra stress, you know, having to
13 fend for yourself in a hostile community could be
14 a cause for what they call a subclinical episode.
15    Q    Who was this doctor?
16    A    My general doctor is Dr. Brian ^Loeffer
17 and my cardiologist is Dr. Zen, both at the VA
18 hospital.
19    Q    In Anchorage?
20    A    In Anchorage.
21        THE WITNESS: And it's 10:30.
22        MS. COUGHLIN: Off record.
23        (Break.)
24        MS. COUGHLIN: We're stopping for
25 today due to Mr. James' schedule, but we're going

15 (Pages 54 to 57)

Exhibit 18

Ellsworth Alexander James
August 1, 2008

Page 38

30 years.
Q  And at the time you left, how much of Avenues' funding was covered by something other than State grants?
A  At the time — I was only there from December 2002 effectively until August. Now, we had — there were several grants that I was working on at the time. There were other things that we were doing that could generate revenue.
     For example, the services that they offered for evaluations and testing by the alcohol and drug people, their costs — the cost structure was totally out of whack. It hadn't been redone in years. People weren't paying. People were often angry with the counselors, so they wouldn't come or they wouldn't pay. So that machine was broken.
     I was able to establish a personnel situation where the community could see itself in the staff. There were no Alaska Natives working for Avenues before I got there. There was actually a barrier, a hesitancy. I had to put up with a lot of stuff to get qualified Alaska Natives to even work in the agency. My point was: How is a person going to come for help if

Page 39

they don't see themselves represented in the staff anywhere? Okay. So I got people on the staff that represented the community. People were coming in. People were actually coming to the Avenues organization for help that didn't have to. Before that the only people that ever came to Avenues is those that had been stopped for DUI. Those kids that had a minor in possession or someone that had to come there to get an evaluation for a legal issue.
     And after I got there, I was able to diversify the staff. We changed the approach and people were coming because they wanted to get help, not because they had to come. So revenues from testing, from the drug and alcohol school, from the kids that were coming in, parents bringing their kids or significant others in for evaluations or what have you, you know, to the alcohol and drug people there, they increased and people were actually paying their bills.
     I did not have enough time to actually realize some of the larger programs I had because it just wasn't enough time, and after August, I was distracted. I couldn't do my work because I was under personal attack. So it could

Page 40

have happened. You know, it was better than it was and it was on its way to being more diversified.
     One of the plans that I was putting in place that — the grant money is really good, it's really great. It's great seed money, but this is a program that's been in existence for 30 years and in 30 years you haven't diversified your revenue. You haven't diversified your income.
Q  By August 2003 what percentage of the Avenues budget was being covered by non-State funds?
A  Can't tell you. All I can tell you is that the people were coming in. I don't have access to any of those accounts. I don't have access to any of that data anymore. What I can tell you is that self-referrals were up and people were actually paying their bills.
Q  Turning to the second page of Exhibit 13.
A  Uh-huh.
Q  You talk about providing transcripts to Vernell University, I believe.
A  Uh-huh.

Page 41

Q  What documents did you provide to Vernell in order to get your degrees?
A  I mentioned that in the previous deposition. Vernell University is not unlike many, many universities today in that it gave credit from their own — toward their own curriculum for previous educational work and life experience. I chose them for that reason. I submitted an evaluation, a small evaluation of my work. And as far as I or any reasonable person could expect, it was evaluated and this is what came from that. My — go ahead.
Q  When you say you submitted an evaluation of your work, is that an evaluation that you prepared?
A  Yes.
Q  Okay. Go on. What else did you give to them?
A  That was it.
Q  Just your evaluation of your work?
A  Uh-huh.
Q  Were there any transcripts that you also provided?
A  No, I don't believe I provided any transcripts. I could have, but I didn't. And I

11 (Pages Exhibit) 18

Page 42

didn't because, you know, my work should have been enough.
Q  There's a reference in this letter about the cost of evaluating -- or not evaluating -- translating official German documents like transcripts into English.
A  Sure. Uh-huh.
Q  Did you have German transcripts?
A  I have transcripts and certificates from places and institutions that I have visited. I wasn't going to go through the expense of providing or translating anything that was not produced in lieu of employment. It's just not something that I was going to do. So it's not saying that specifically I'm not going to do this because I don't want to go through the expense. The meaning in this is that this is what I have, but, you know, I didn't present this to you. This enriches my experience for which you hired me.
    Again, I'll reiterate for the umpteenth time that none of these things were produced in lieu of employment. This is all after the fact.
Q  When you say none of these things were

Page 43

produced in lieu of employment, do you mean produced as the basis for your job offer?
A  Yes. I said, my value is my experience. This is what I can do. From the -- from looking at your situation, you need to diversify your programs, you need to develop programs. That's what I do. That's where I can help you.
    (Exhibit 14 marked.)
Q  Exhibit 14 is some pages that Doug McCloskey faxed to me that he testified were ultimately given to the board.
A  Uh-huh.
Q  Looking at the fax page No. 17, which is about six pages in. That's it.
A  Uh-huh.
Q  This is printouts dated October 2003 from the Degrees R Us web site.
A  Uh-huh.
Q  There's an order form two more pages in. Is that the kind of form that you filled out to get your Vernell degrees?
A  Yes, it is.
Q  And were you allowed to pick your field of study and the year you wanted for your degree?
A  Uh-huh.

Page 44

Q  And tell them what field you wanted that degree in and --
A  That's right.
Q  -- and whether your degree was going to be with honors, high honors or highest honors?
A  That's right, uh-huh.
Q  And you were allowed to choose your GPA?
A  Yes.
Q  You've also indicated in your discovery responses that you've had health problems as a result of Mr. Hegre's answers -- or Mr. Hegre's statements.
A  Uh-huh.
Q  What health problems do you tie to anything that Mr. Hegre did and for which you want The Salvation Army to be responsible?
A  It's important to realize what Captain Hegre did and how this impacted me personally, how this impacted my family, how it impacted my ability to work.
    Captain Hegre was a preacher, a religious person, a man of the cloth, religious leader. The Salvation Army wears very big shoes in the Southeast. It's been there a long time. Especially among Native people. It's also very

Page 45

important to those people that are having serious issues in life, those that suffer from substance abuse issues, those that suffer from neglect or abandonment issues, abuse issues, et cetera, et cetera. These are the people that really need something in their lives, and those that cling to religion or spiritual beliefs are those people that The Salvation Army appeals to.
    They help -- The Salvation Army helps these people and so these people tend to be very reverent. Anybody that has great need for change in their lives and sees that as an opportunity to change, they're going to give 110 percent. They're going to give a lot because they're ready for a change. And so you have those people that actually attend Salvation Army services.
    And then you have another group of people that considers themselves as healant, religious or spiritual, no matter what affiliation they have. Whether they're Catholic, Episcopal or Baptist, they see themselves as Christians. So even though they may not attend Salvation Army church services on a regular basis or at all, they recognize the Salvation Army

12 (Pages 42 to 45)

Exhibit 18
Page 8 of 12

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

3fc1570b-59b2-4e6b-a7a2-94e950245e02