Ellsworth Alexander James
August 1, 2008

Page 14

1 longer with Avenues. As a matter of fact,
2 Avenues was in stages of closure, and so it was
3 in church meetings, the ministorial (ph)
4 alliance, if you will. It was in community
5 meetings. It was in his parish that he was
6 continuing to say these things.
7     Now, you asked what these things
8 are. These things are, one, that I was fired for
9 cause, and cause could be whatever he wanted to
10 add on that particular day.
11   Q  And what were some of the causes that he
12 attached?
13   A  Well, of course the cause -- I guess,
14 the letter his supervisor wrote to human
15 resources, to Salvation Army human resources in
16 Long Beach, was that he called me a liar, a
17 thief, a criminal, vehemently, and I guess
18 anything that he could think of in between. Now,
19 he actually told that to his supervisor. I have
20 reason to believe that he told that to everyone
21 else as well.
22   Q  And what's your reason to believe that?
23   A  This is what I heard, and the reason
24 that I believe it is because in the discovery,
25 I've got the documents from his supervisor, Major

Page 15

1 Rudd, basically saying what he said that.
2   Q  To Major Rudd. But what's your reason
3 for believing that Mr. Hegre was saying these
4 things to other people?
5   A  Basically everybody in town.
6   Q  And what's your basis for believing
7 that?
8   A  Hearing it.
9   Q  Hearing Mr. Hegre say this?
10   A  No, no. I heard it from Mr. Murphy,
11 okay. I heard it from Mr. Klabundie. It
12 reverberated from everybody else. I mean, in a
13 town of 15, 1600 people if someone maligns your
14 character, you hear about it. He said this or he
15 said that. Okay. I mean, I can nail it down to
16 one or two sources. I could probably nail it
17 down to three sources. I can nail it down to
18 three sources. I gave you three sources; Steve
19 Murphy, Guy Klabundie and his superior, Major
20 Rudd.
21     The superior, Major Rudd, is the
22 most graphic because he actually wrote it down.
23 Steve Murphy actually told me that first person.
24 Captain Hegre told him; Steve Murphy told me. So
25 that's pretty much a direct line. I heard about

Page 16

1 it from everybody else in the community, but
2 direct links, those three.
3     (Exhibit 9 marked.)
4   Q  Can you identify Exhibit 9?
5   A  This is a letter from -- yeah, I
6 recognize it. Sure.
7   Q  And just for the record, can you state
8 what it is?
9   A  It's a letter from Captain Hegre.
10   Q  To you dated September 18th, 2003?
11   A  Yes.
12   Q  And do you remember getting this letter?
13   A  Yes.
14   Q  What did you do in response?
15   A  To tell you the truth, I did a lot of
16 things. I don't remember specifically what I did
17 in response. I mean, by this time, to me, this
18 was a farce. It was a farce because this never
19 should have been an issue. It never should have
20 been an issue, and it shouldn't have been an
21 issue because this is about certification of
22 credentials and credentials were never submitted
23 for this position.
24     I received an offer of employment
25 based on my work experience, the experience that

Page 17

1 I offered. Not even did the State ask for five
2 or ten -- I don't remember how many -- substance
3 abuse references. I said in the initial
4 conversations that I hadn't worked in this field
5 directly for ten or 15 years and most, if not
6 all, of the direct references to my work or
7 training in this field were long gone and that if
8 that is what they needed, I can't provide that.
9     So at this time I regard this as a
10 miscarriage. It's a farce, because they're
11 trying to certify something that was not
12 presented in lieu of employment. So by this
13 time, you know, this is a train that's going on
14 without me.
15   Q  Do you agree that the State had informed
16 Avenues that if they couldn't prove that you had
17 at least a master's, Avenues' funding would be
18 taken away?
19   A  Not my problem. If they didn't
20 understand that, if the board did not understand
21 that, then that was between the board and the
22 State, not between me and the State. I -- I
23 distinctly remember saying in the previous
24 deposition that when this first started to
25 happen, I called Loren Jones. I actually met

Ellsworth Alexander James
August 1, 2008

Page 18

1 Loren Jones shortly after I was hired just before
2 he retired. I asked him about this, and he said,
3 something's wrong with that. Out in rural areas
4 it's hard to find anybody and, you know, we never
5 required -- we never required a director to have
6 specific credentials or specific certifications
7 because it's very hard to find someone with those
8 certifications.
9        That's why the board could hire
10 anyone that they felt could actually deliver
11 through work experience or what have you, and
12 that was one of the major differences between the
13 Division of Alcohol and Substance Abuse and
14 behavioral health. Most people that worked in
15 these organizations under the Division of Alcohol
16 and Substance Abuse were not certified. A lot of
17 them the only certification that they had was
18 that they were in recovery.
19        So to be more specific, according
20 to Alaska statute at that time -- it may have
21 changed or it may have been rewritten after
22 that -- but according to Alaska statute at that
23 time, the State could not dictate who a board
24 could hire. Now, if that organization had a
25 grant through the State, they could -- they

Page 19

1 could -- and how did he put it? Advise, or they
2 could -- he didn't use the word require. Suggest
3 that someone in this position have these
4 credentials. And I think the last director,
5 Mr. Hogan, also said in his letters that the
6 State cannot dictate who the board can hire.
7        Now, again, going back to the
8 impetus of your question. The board hired me.
9 The board hired me -- they gave me an offer of
10 employment based on our conversations, based on
11 what I told them that I could deliver. Now, if
12 they misunderstood their relationship with the
13 State, that's not between me and them; that's
14 between them and the State. So if the State was
15 going to withhold funds, that's entirely between
16 the board and the State. It's something they
17 have to iron out.
18        Now, if that had happened and if
19 Captain Hegre had represented the accurate
20 scenario of my hiring, if he had accurately
21 represented what had transpired in those
22 pre-offer conversations, then I could have helped
23 the board to reach some kind of an agreement with
24 the State in regard to what the statute was at
25 that time, what the need was in the community and

Page 20

1 what I was able to do in the community. I never
2 got an opportunity to do that because he didn't
3 represent what happened.
4        And, in essence, I believe that the
5 State may have taken a different tack had they
6 had the information. They didn't have the
7 information. According to this, they are led to
8 believe -- they are assuming based on this
9 information that I presented these and that I
10 represented myself and I said these are
11 certified, these are what I am using for my
12 employment. Not the case. Didn't happen. They
13 didn't know that.
14 Q    Were you in direct communication with
15 the State during this period?
16 A    I would have to say I wasn't in direct
17 communication because any time I tried, they
18 wouldn't talk to me. That's not meaning to say I
19 didn't try.
20 Q    And I think one of the exhibits that we
21 looked at before was the 23-page fax that you
22 sent to Karen Pearson.
23 A    Sure.
24        (Exhibit 10 marked.)
25 Q    Is Exhibit 10 a letter dated

Page 21

1 August 28th, 2003 that you wrote to Joel
2 Gilbertson?
3 A    Uh-huh.
4 Q    In this letter do you represent yourself
5 as having been a consulting psychologist for over
6 15 years?
7 A    Yes. Yes, I do represent myself as
8 being a consulting psychologist for over 15
9 years. And as I said previously, I've lived --
10 I'm 47 years old and I've lived outside the
11 country almost as long as I have in, and what you
12 call yourself depends on where you are. And, to
13 me, a consulting psychologist has -- is not what
14 you would consider a psychologist in this
15 country.
16        Again, I have to reiterate that
17 this should never have been a topic of discussion
18 in that this is not what I represented in order
19 to receive an offer of employment. This is not
20 what was presented during the initial
21 conversations. Now, referring to myself as a
22 consulting psychologist does not insinuate that I
23 have licensure, and I believe that's what you're
24 getting at. The term psychologist in this
25 country. Okay. Not what I was doing. Not what

6 (Pages 18 to 21)

*Exhibit* /8

Page_ /0 of 12 _

3fc1570b-59b2-4e6b-a7a2-94e950245e02

Page 42

1  didn't because, you know, my work should have
2  been enough.
3      Q    There's a reference in this letter about
4  the cost of evaluating -- or not evaluating --
5  translating official German documents like
6  transcripts into English.
7      A    Sure. Uh-huh.
8      Q    Did you have German transcripts?
9      A    I have transcripts and certificates from
10 places and institutions that I have visited. I
11 wasn't going to go through the expense of
12 providing or translating anything that was not
13 produced in lieu of employment. It's just not
14 something that I was going to do. So it's not
15 saying that specifically I'm not going to do this
16 because I don't want to go through the expense.
17 The meaning in this is that this is what I have,
18 but, you know, I didn't present this to you.
19 This enriches my experience for which you hired
20 me.
21         Again, I'll reiterate for the
22 umpteenth time that none of these things were
23 produced in lieu of employment. This is all
24 after the fact.
25      Q    When you say none of these things were

Page 43

1  produced in lieu of employment, do you mean
2  produced as the basis for your job offer?
3      A    Yes. I said, my value is my experience.
4  This is what I can do. From the -- from looking
5  at your situation, you need to diversify your
6  programs, you need to develop programs. That's
7  what I do. That's where I can help you.
8          (Exhibit 14 marked.)
9      Q    Exhibit 14 is some pages that Doug
10 McCloskey faxed to me that he testified were
11 ultimately given to the board.
12     A    Uh-huh.
13     Q    Looking at the fax page No. 17, which is
14 about six pages in. That's it.
15     A    Uh-huh.
16     Q    This is printouts dated October 2003
17 from the Degrees R Us web site.
18     A    Uh-huh.
19     Q    There's an order form two more pages in.
20 Is that the kind of form that you filled out to
21 get your Vernell degrees?
22     A    Yes, it is.
23     Q    And were you allowed to pick your field
24 of study and the year you wanted for your degree?
25     A    Uh-huh.

Page 44

1      Q    And tell them what field you wanted that
2  degree in and --
3      A    That's right.
4      Q    -- and whether your degree was going to
5  be with honors, high honors or highest honors?
6      A    That's right, uh-huh.
7      Q    And you were allowed to choose your GPA?
8      A    Yes.
9      Q    You've also indicated in your discovery
10 responses that you've had health problems as a
11 result of Mr. Hegre's answers -- or Mr. Hegre's
12 statements.
13     A    Uh-huh.
14     Q    What health problems do you tie to
15 anything that Mr. Hegre did and for which you
16 want The Salvation Army to be responsible?
17     A    It's important to realize what Captain
18 Hegre did and how this impacted me personally,
19 how this impacted my family, how it impacted my
20 ability to work.
21         Captain Hegre was a preacher, a
22 religious person, a man of the cloth, religious
23 leader. The Salvation Army wears very big shoes
24 in the Southeast. It's been there a long time.
25 Especially among Native people. It's also very

Page 45

1  important to those people that are having serious
2  issues in life, those that suffer from substance
3  abuse issues, those that suffer from neglect or
4  abandonment issues, abuse issues, et cetera, et
5  cetera. These are the people that really need
6  something in their lives, and those that cling to
7  religion or spiritual beliefs are those people
8  that The Salvation Army appeals to.
9          They help -- The Salvation Army
10 helps these people and so these people tend to be
11 very reverent. Anybody that has great need for
12 change in their lives and sees that as an
13 opportunity to change, they're going to give
14 110 percent. They're going to give a lot because
15 they're ready for a change. And so you have
16 those people that actually attend Salvation Army
17 services.
18         And then you have another group of
19 people that considers themselves as healant,
20 religious or spiritual, no matter what
21 affiliation they have. Whether they're Catholic,
22 Episcopal or Baptist, they see themselves as
23 Christians. So even though they may not attend
24 Salvation Army church services on a regular basis
25 or at all, they recognize the Salvation Army

Exhibit 18

Page 11 of 12

Ellsworth Alexander James
August 1, 2008

Page 46

1 church as a Christian entity for which they have
2 reverence and respect. People don't question
3 pastors. Not readily anyway.
4       The problem this created for me is
5 that to have a Salvation Army pastor; one,
6 Salvation Army, reputation of Salvation Army;
7 two, pastor, man of God, man of the cloth, man
8 you go see on Sunday to actually come out against
9 one person, to speak out against one person turns
10 on the green light, okay. Now, I talk a lot
11 about ambient racism, okay. In federal issues,
12 especially EEO issues, the proof of racism is not
13 required because we realize that racism is
14 inherent in not only the African American
15 experience, but the African American experience
16 in relation to the American experience. You
17 know, it's being worked on, it's being addressed
18 through training and education, but it is there.
19       So being on the island, being the
20 only black resident, year-round resident on the
21 island, okay, has a certain amount of racial
22 tension to it. Now, normally this tension can
23 remain in check, you know, it's dinnertime
24 discussion. You discuss it in your own home.
25 Whatever your beliefs are, you usually keep it to

Page 47

1 yourself. But when you have a religious person,
2 when you have a community authority, a community
3 figure actually come out and condemn something,
4 condemn someone for whatever reason, okay, the
5 specific reason becomes unimportant. The reality
6 is that this person must have reasons for coming
7 out against this person, so this guy is no good.
8 This guy has, you know, nefarious designs. And
9 so these people, they direct the stereotypes
10 toward this person. This person was me.
11       You know, we practically froze to
12 death because we couldn't get people to deliver
13 oil to us. Again, as I said in the previous
14 discussions, the brick house was where people
15 would just drive by and look. Oh, that's where
16 he lives. Okay. This community leader, by
17 speaking out, you have people that want to please
18 him, that think they're doing right. They think
19 they're working for him in coming out against me.
20       When I actually had to leave my
21 house, I was moving my refrigerator out. And it
22 was my refrigerator. I bought it. The gentleman
23 from across the street came out and says, why are
24 you moving this refrigerator out of the house? I
25 said, it's my refrigerator. I'm taking it with

Page 48

1 me. He said, well, wasn't there a refrigerator
2 in the house when you bought it? I said yes, it
3 broke down. It has been junked. Oh, okay. So
4 my son and I continued to load this refrigerator
5 onto the vehicle that we were moving with. This
6 gentleman called the police on me for theft. He
7 said that I was stealing from the home. This is
8 not someone that knew me. This is not someone
9 that I would consider even an acquaintance, but
10 this is someone that was connected to the society
11 and said, they're stealing. Captain Hegre was
12 right, this guy, he's stealing the refrigerator.
13       The man had never been in my house.
14 He would have no idea what the appliances looked
15 like before I moved in. He wasn't there when I
16 bought my refrigerator, so he would not know, but
17 he assumed based on what he had heard that, you
18 know, I must be up to mischief. I'm stealing
19 something. And he actually called the police.
20       Now, that didn't help a whole lot
21 because of the blotter reports you have in rural
22 communities. So, you know, big and pretty in the
23 paper the next day it's reported that someone
24 moving out of the house at this address was
25 stealing a refrigerator or stealing appliances,

Page 49

1 okay. That really didn't help a whole lot. And
2 it's things like this that continued. It's
3 things like this that kept people from actually
4 helping my programs. The only people that I
5 served after that were Native people that nobody
6 else would help.
7       So when you have a leader of the
8 community come out against someone, then you're
9 going to have a mixed bag of results. You've got
10 people that consider themselves incredibly
11 spiritual or Christian that are going to do
12 things to that person because they think it's the
13 right thing to do. You have people that are
14 going to ostracize that person. You have people
15 that are going to avoid that person and that
16 person's family.
17       My wife today does not drive. She
18 is scared to death of driving a vehicle. Not
19 because she's afraid of the vehicle, not because
20 she can't drive, not because she is afraid of
21 traffic, okay. This woman drove a Suburban
22 through Florida traffic. She can whip it in and
23 out of anywhere, just like any soccer mom can.
24 She refuses to drive because every time she got
25 behind the wheel she was stopped by the local

13 (Pages 46 to 49)    18

Exhibit

Page 12 of 12

William H. Hogan
April 2, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF ALASKA


ELLSWORTH ALEXANDER JAMES,)
                          )
            Plaintiff,    )
                          )
vs.                       )
                          )
THE SALVATION ARMY CHURCH,)
ET AL.,                   )
            Defendant.    )
_____) Case No. 05-CV-0007-JWS



_____

VIDEOTAPED DEPOSITION OF
WILLIAM HOGAN
_____



April 2, 2008
9:00 a.m.



Taken at:
KIRKPATRICK & LOCKHART/PRESTON GATES & ELLIS
420 L Street, Suite 400
Anchorage, Alaska  99501



Reported by:  Sandra M. Mierop, CRR, CCP, CBC

Exhibit _19_

Page _1_ of _5_

Northern Lights Realtime & Reporting, Inc
(907) 337-2221