William H. Hogan
April 2, 2008

Page 6

1  me with some documents in our -- in response to
2  our Subpoena which I've marked as one large
3  exhibit which we've marked as Hogan Exhibit 1.
4       Can you identify that exhibit?
5    A.  Yes. I believe these are the notes,
6  e-mail, and various documents that I have related
7  to Mr. James and the organization called Avenues
8  in Wrangell, Alaska.
9    Q.  And how did you come to create this
10 file?
11   A.  I created this file over several months
12 in 2003 as a result of a concern that our
13 division had regarding the credentials of
14 Mr. James who was then employed as the executive
15 director of Avenues, the substance abuse agency
16 in Wrangell.
17   Q.  And were the documents that are marked
18 as Exhibit 1 created at or near the time of the
19 dates on those documents?
20   A.  They were.
21   Q.  And is it your regular practice to make
22 and keep documents of this kind?
23   A.  It is.
24   Q.  And was that file maintained in the
25 regular course of DHSS's business?

Page 7

1    A.  Yes, it was.
2    Q.  And did you rely on the information in
3  Exhibit 1 in making decisions for DHSS?
4    A.  Yes, I did.
5    Q.  In 2003, what was DHSS's relationship
6  with Avenues to Recovery?
7    A.  Our department really does not provide
8  direct behavioral health services other than
9  those provided at Alaska Psychiatric Institute.
10 It does provide funding for a number of mental
11 health and substance abuse agencies throughout
12 the State; and Avenues was one of those agencies.
13 We provided state-grant funding to that agency to
14 provide certain outpatient substance abuse
15 services.
16   Q.  To your --
17   A.  I'm sorry. We also provide oversight in
18 that we ensure the quality of the services that
19 are being provided based on a certain set of
20 standards that we have for those agencies.
21   Q.  And are those standards codified
22 somewhere?
23   A.  They are referenced in State statute and
24 regulation.
25   Q.  And are there also granting requirements

Page 8

1  set forth in the grants?
2    A.  There are granting requirements that are
3  outlined in what's called the Notice of Grant
4  Award. It's a document that we submit or give to
5  all of our grantees.
6    Q.  And in 2003, did DHSS have any standards
7  with regard to the credentials of executive
8  directors for agencies to whom they provided
9  grants?
10   A.  We have -- or had an expectation that
11 a -- an executive director had experience in
12 providing substance-abuse services.
13   Q.  And beyond experience, were there any
14 additional qualifications required?
15   A.  There's an expectation that the person
16 have at least a master's degree.
17   Q.  In any particular field?
18   A.  In a field related to substance abuse.
19   Q.  And are those requirements set forth in
20 statutes, regulations, or the granting document?
21   A.  I believe they are set forward in
22 regulation and in the granting document.
23   Q.  At some point, did issues arise
24 regarding Mr. James' qualifications?
25   A.  It did.

Page 9

1    Q.  How did that happen?
2    A.  They arose as a result of Mr. James'
3  request to be appointed to the Alcohol -- the
4  Advisory Board on Alcoholism and Drug Abuse.
5  This is an advocacy, planning, and education
6  agency. Those appointments -- the appointments
7  to those boards are actually -- or to that board
8  are made by the Governor. And in -- while the
9  State was considering Mr. James' application, we,
10 meaning the State, also required that we receive
11 Mr. James' Social Security number, because the
12 board was planning, I believe, to tour the
13 correctional facility in Seward, and from a
14 Department of Corrections' perspective it was
15 necessary to ensure that the people, I guess,
16 going on that tour did not have any significant
17 background problems.
18      And when Mr. James submitted his
19 Social Security number to the Department of
20 Corrections, they could not verify that there was
21 a match between the Social Security number and
22 Mr. James.
23      That caused us, within our
24 Department, to take a closer look at Mr. James'
25 credentials.

Exhibit 19
Page 2 of 5

3 (Pages 6 to 9)

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

William H. Hogan
April 2, 2008

Page 10

1   Q. And what information had you previously
2   had about Mr. James' credentials?
3   A. We had the -- the board of directors at
4   Avenues had submitted Mr. James' resume, and
5   frankly, in hindsight, we took that at face
6   value. Because, from our perspective, the
7   employment relationship really is between the
8   board and the executive director. It is
9   necessary for the board to submit a resume so
10  that we can at least look at the resume and
11  determine whether or not someone's credentials do
12  meet the regulations and standards.
13  Q. And did Mr. James' resume indicate that
14  he had at least a master's in the required field?
15  A. It did.
16  Q. And did it also indicate that he had the
17  kind of experience that the State would expect of
18  an executive director?
19  A. It -- it seemed to suggest that, yes.
20  Q. When you took a -- another look at this
21  resume, what did you find?
22  A. Well, we found several things. For one,
23  we found a discrepancy between what the resume
24  said regarding where Mr. James had obtained a
25  Ph.D. It -- the resume indicated that Mr. James

Page 11

1   had obtained both a master's and a Ph.D. from a
2   University named Vernell, I believe it's in
3   Middletown, New York. When we checked or tried
4   to check with that organization, we determined
5   that the organization -- that the university was
6   not accredited and, in fact, when we attempted to
7   contact the university, we had no indication that
8   the university even existed at that point.
9       There was also a discrepancy in
10  the -- I guess it's called a membership directory
11  of the American Psychological Association. In
12  that directory, Mr. James indicated that he
13  received a master's degree from Humboldt State.
14  We contacted Humboldt State, and they had no
15  indication or no record of Mr. James having
16  obtained a degree from that university.
17  Q. You indicated that when you looked into
18  Vernell, you found no proof that that university
19  existed at that point. Did you ever discover any
20  evidence that the university had ever existed?
21  A. I'm not sure. I know we tried to
22  contact the university and we could not make
23  contact with the university. So, I don't know if
24  it ever existed.
25  Q. Did you ever get a resolution of the

Page 12

1   issue with Mr. James' Social Security number?
2   A. Not to my knowledge.
3   Q. Turning to page marked DHSS 77 in
4   Exhibit 1.
5       Can you identify the letter that
6   goes from DHSS 77 to DHSS 79?
7   A. This is a letter I sent as the director
8   of the Division of Behavioral Health to Peter
9   Hegre who was the president of the board of
10  Avenues at that time.
11  Q. Had you and Mr. Hegre previously had
12  discussions about this issue prior to your
13  writing this August 1st letter?
14  A. I know I had one or two phone
15  conversations with Mr. Hegre or Captain Hegre. I
16  can't remember if I had conversations prior to
17  sending the letter or after sending the letter,
18  to be honest with you.
19  Q. Okay. What was your purpose in sending
20  this letter?
21  A. It was to outline the concerns that we
22  had as the Division of Behavioral Health,
23  Department of Health and Social Services about
24  Mr. James' credentials.
25  Q. And does this letter accurately state

Page 13

1   the concerns you had at that time?
2   A. I believe it does, yes.
3   Q. Turning to DHSS 79, this indicates that
4   no further funds would be provided to Avenues
5   unless the required documentations provided for
6   Dr. James or arrangements had been made by the
7   board for professional oversight of the program.
8       Why did you decide to cut off
9   funding to Avenues?
10  A. I believe -- and I may be wrong on this.
11  I believe that the organization was already on
12  what we determined -- or what we call probation.
13  That there was some compliance concerns with the
14  agency, and it was our feeling that, based on the
15  concern regarding the credentials of the
16  executive director, that it was necessary for us
17  to withhold funding for -- I guess it was the
18  second quarter of what was then fiscal year '03.
19      So, it was the agency -- we already
20  had some concerns regarding compliance, and based
21  on our concern regarding the executive director
22  and the credentials of the executive director, we
23  determined that we needed to withhold funding
24  from the agency.
25  Q. And in the event that Avenues was not

*Exhibit 19*
*Page 3 of 5*

4 (Pages 10 to 13)

William H. Hogan
April 2, 2008

Page 30

1  think that we -- we, from the State perspective
2  had -- or would give an organization a little
3  more flexibility than one who was trying to be
4  permanently appointed. And I believe
5  Ms. Williams was there in an acting capacity or
6  interim capacity.
7     Q.   Do you know when the State of Texas
8  started to require certification and licensure
9  for substance-abuse counselors and agencies?
10    A.   I do not know that.
11    Q.   Don't know that.
12         And are -- are you familiar with a
13 practice in a group, let's say, to provide
14 counseling or substance-abuse-type services in
15 adjunct to other services?
16    A.   I'm not entirely sure of what you're
17 saying.
18         Could you give me an example?
19    Q.   Well, let's say we have a -- a woman's
20 home that would take in women that were homeless
21 and were having issues. If a part of those
22 services required talking about substance abuse
23 and trying to create some kind of -- kind of
24 program to prevent it, these kinds of services
25 would be considered today substance-abuse

Page 31

1  services?
2     A.   I guess I'm not entirely sure. It
3  sounds like what you're describing is perhaps a
4  program that serves homeless women or families,
5  and there -- you know, it's conceivable that some
6  discussion about substance abuse or substance
7  abuse problems may take place in that program.
8  But based on what you're describing, I'm not sure
9  that would be an agency that we, for instance, in
10 Alaska might certify as a substance-abuse agency.
11    Q.   Right. Are you aware of at any point in
12 time nationally, pulling on your experience, that
13 there were organizations or counselors that did
14 not require licensure because there was no
15 criteria for substance-abuse licensure in that
16 particular state at that particular time?
17    A.   Organizations -- I would say there
18 probably are some organizations in some states
19 who do not require licensure.
20    Q.   Okay. And you don't know when the State
21 of Texas started to require --
22    A.   I do not know that.
23    Q.   Or the grandfathering of any
24 organizations or people that would have obtained
25 licensure that did not have licensure before?

Page 32

1     A.   I do not know that.
2     Q.   I understand. Let me just check my
3  notes here.
4         All right. The last question I
5  have is: Would it be sufficient to say that if a
6  policy-making board approached the State with a
7  candidate, that -- after discussing with that
8  candidate that they thought was right for the
9  position, irrespective of what the State would
10 have liked to have seen, the State would have
11 given to or allowed the policy-making board to
12 make a -- to extend an offer of employment?
13    A.   This goes back to my -- I believe my
14 previous answer, and that is: We would certainly
15 enter into a discussion with the board of
16 directors, but it is necessary for an executive
17 director to meet minimal standards. So, it would
18 depend on what sorts of qualifications that --
19 that candidate had.
20    Q.   Exactly. Of course. All right. And,
21 again, Captain Hegre was your point of contact?
22    A.   Yes, he was.
23         MR. JAMES: I have no further
24 questions.
25         MS. COUGHLIN: I just have a

Page 33

1  couple.
2              FURTHER EXAMINATION
3     Q.   (BY MS. COUGHLIN) You indicated that the
4  State would give a -- a board a certain amount of
5  leeway, but would want to have an executive
6  director to have certain minimal qualifications.
7  In your opinion, did Mr. James' qualifications
8  meet that minimal standard?
9     A.   They did not.
10    Q.   And was it more concerning to the State
11 that he lacked these qualifications, or that his
12 resume appeared to misrepresent the
13 qualifications that he had?
14    A.   I would say both. Some of both. Again,
15 based on what we had initially seen in Mr. James'
16 resume, we assumed that he did meet the
17 qualifications; and it was only after we began to
18 get additional information that we had
19 reservations or questions about that. So I would
20 say both. That he appeared not to meet the
21 qualifications; and that it appeared as though
22 his resume had been falsified.      Exhibit  19
23         MS. COUGHLIN: No further
24 questions.                           Page 4 of 5
25         MR. JAMES: I have just one more.

9 (Pages 30 to 33)

William H. Hogan
April 2, 2008

Page 14

1  able to prove that Mr. James had the academic and
2  work experience qualifications, would that mean
3  that Avenues would lose funding forever?
4      A.  Not usually.  What we try to do is to
5  work with the agency to -- and provide technical
6  assistance and support to bring them into
7  compliance with our regulations and standards.
8          You know, occasionally the
9  Department has and still does take action that
10 results in loss of finances or loss of grant
11 funding, in situations where it's apparent that
12 the organization cannot make the necessary
13 changes.  But that's sort of a last resort from
14 our perspective.
15     Q.  And at this time, were you asking
16 Avenues to either provide proof that Mr. James
17 had the necessary credentials or get an executive
18 director who had those necessary credentials?
19     A.  Yes.
20     Q.  And does Exhibit 1 contain additional
21 correspondence between DHSS and Mr. James on this
22 subject?
23     A.  It does.
24     Q.  Were you in contact with both Mr. James
25 and with Mr. Hegre in order to get answers to

Page 15

1  your questions?
2      A.  I don't remember ever speaking to
3  Mr. James directly.  The correspondence was
4  through letters.  Mr. Hegre's correspondence was
5  also through letters, and, again, I do remember
6  talking to Captain Hegre maybe once or twice
7  about this.
8      Q.  And what do you remember of those
9  conversations with Mr. Hegre?
10     A.  Well, essentially, I reaffirmed or
11 reiterated that the employment relationship was
12 between the board of directors and the executive
13 director.  It was really ultimately their
14 decision to make some determination about --
15 about that relationship.  We continued to -- or I
16 expressed my concern over our inability to verify
17 the credentials that Mr. James had put forth in
18 his resume, and reiterated our stance that until
19 there was some action taken we would, in all
20 likelihood, withhold funding.
21     Q.  Was the State Avenues' primary fund
22 source at that time?
23     A.  I am not -- I'm not sure of that.  The
24 fund sources tend to vary from agency to agency.
25 Many of our agencies rely on Medicaid as a fund

Page 16

1  source.  Many of our agencies do rely on State
2  funding.  But the percentage tends to vary
3  depending on the agency.  So I'm not entirely
4  sure if Avenues was primarily funded through
5  State grants.
6      Q.  Do you know if the State was a
7  significant source of funding?
8      A.  I would think it was, but I don't know
9  that for sure.
10     Q.  Turning to the letter that begins at
11 DHSS 70 and goes through DHSS 72.
12         On page 70 in the second paragraph,
13 Mr. James' letter states:  I have traditional
14 training in substance abuse, have been part of a
15 group practice and spent many years as a
16 consulting psychologist working with other
17 cultures, governments, and other structures.
18         Were you ever able to verify
19 Mr. James' claims of his prior work experience?
20     A.  Not -- not to my knowledge, and not to
21 our satisfaction.
22     Q.  What does it take to be a psychologist?
23     A.  Well, it takes -- depending on where you
24 get your degree from, usually in psychology
25 the -- the Ph.D. is considered the terminal

Page 17

1  degree or the highest degree.  And then you need
2  to have, I would think -- in fact, I know this,
3  at least a couple of years' post-degree
4  experience working in whatever part of psychology
5  you choose to work in, either directly with
6  clients or in some other capacity.
7          I'm almost certain you need to pass
8  some sort of national test or exam.  And then you
9  would also need to meet the State licensing
10 requirements to be licensed in that State to
11 practice as a psychologist.
12     Q.  And was Mr. James asked to provide proof
13 of his work experience in this area?
14     A.  I -- I believe he was.  Again, what we
15 were trying to determine was how much experience
16 Mr. James had in the field of substance abuse.
17 We were not requiring that Mr. James or anyone
18 else who was -- who might function as an
19 executive director of an agency -- we were not
20 suggesting that he needed a Ph.D.  But we were
21 trying to determine that he at least had a
22 master's degree and that he had some experience
23 in the substance-abuse field.
24     Q.  And were you ever able to confirm
25 those -- those requirements?

Exhibit 19
Page 5 of 5

5 (Pages 14 to 17)

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

ELLSWORTH ALEXANDER JAMES,       ]
                                 ]
            Plaintiff,           ]
                                 ]
v.                               ]
                                 ]
THE SALVATION ARMY CHURCH, ET AL ]
                                 ]
            Defendants.          ] Case 1:05-cv-0007 JWS
                                 ]

VIDEOTAPED DEPOSITION ON ORAL EXAMINATION
OF
A. DOUGLAS MCCLOSKEY

1:37 p.m.
July 14, 2008
Wrangell Police Department
Public Service Building
Zimovia Highway
Wrangell, Alaska 99929

Exhibit 20
Page 1 of ____

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104 Ketchikan Alaska 99901